NOT DESIGNATED FOR PUBLICATION

No. 117,646

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of K.G., J.G., and T.G.,
Minor Children.

MEMORANDUM OPINION

Appeal from Harvey District Court; MARILYN M. WILDER, judge. Opinion filed November 9, 2017. Affirmed.

*Donald R. Snapp*, of Newton, for appellant natural mother.

*Kaitlin M. Dixon,* assistant county attorney, and *Joseph L. Uhlman*, legal intern, for appellee.

Before STANDRIDGE, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM: Mother appeals from the termination of parental rights to her children, K.G., J.G., and T.G. Specifically, Mother claims the State failed to present clear and convincing evidence that she is unfit, that her condition is unlikely to change in the foreseeable future, and that her parental rights should be terminated. We have reviewed the entire record in this case and find clear and convincing evidence to support the district court's decision to terminate Mother's parental rights. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother's children first came to the attention of the Kansas Department for Children and Families (DCF) on July 30, 2015. On that day, local police officers reported to DCF that they had discovered Mother passed out in her van with her and Father's two youngest children, J.G. (age 9) and T.G. (age 3 months), in the vehicle. The van was

1

located in a store parking lot. The officers believed Mother was under the influence of drugs because she was extremely difficult to awaken and took considerable time to focus on her situation.

After receiving the report, DCF workers attempted to locate Mother and the children at various addresses. DCF workers ultimately were able to make contact with Father at the family home. Father said he had no idea where his children were, reporting that Mother had left with the children several days earlier. Father also told DCF workers that Mother was using methamphetamine.

Later that day, a DCF worker was able to find the oldest child, K.G. (age 14), at her maternal grandmother's home. While interviewing K.G., the teen reported that Father had yanked hair out of her head two weeks earlier during an argument. The DCF worker noted that the missing hair was obvious from K.G.'s scalp. K.G. also reported there was on-going domestic violence in their home between Mother and Father.

Shortly after talking with K.G., Mother arrived in a van at the grandmother's house with J.G. and T.G. When asked, Mother reported that she was living in a tent at a nearby lake with a friend. The DCF worker asked Mother to complete a safety plan with DCF to allow the children to stay with the grandmother while DCF assessed the family's circumstances. Mother got angry in response to the worker's request and threw a full baby bottle at the general area where grandmother, who was holding T.G., was situated. At this point, the DCF worker called for police assistance.

The State ultimately filed an ex parte motion seeking protective custody of the three children, which was granted by the court the same day it was filed. Shortly thereafter, the court entered an order granting DCF temporary custody of the children. DCF placed the children in the home of their maternal grandparents.

Saint Francis Community Services (SFCS) was assigned to supervise efforts to reintegrate the children with their parents. When the children were removed from the home, the two older children provided SFCS additional information. K.G. and J.G. both reported that there was on-going domestic violence in the home and that Father repeatedly verbally and physically abused Mother. K.G. also told DCF employees that both Mother and Father used methamphetamine and that K.G. was the person primarily responsible for looking after the younger children. K.G. noted the family moved frequently because Father would get fired from his job and they would get evicted from their home.

At a subsequent adjudication hearing, Mother and Father stipulated that the children qualified as children in need of care (CINC) and the court ordered the children to remain in out-of-home placement. At the time of adjudication, K.G. was 14 years old, J.G. was 10 years old, and T.G. was less than a year old.

The first case plan meeting was held in August 2015. Both parents attended. After this meeting, a written permanency plan setting forth specific tasks designed to achieve the goal of reintegration was prepared by SFCS and adopted by the court. In order to comply with the plan for reintegration, Mother was required to successfully complete the following tasks: (1) report any contact with law enforcement to SFCS within 24 hours of occurrence; (2) obtain a drug and alcohol evaluation and follow any recommendations until successfully discharged; (3) refrain from abusing drugs or alcohol throughout the duration of the case and submit to random tests to verify compliance; (4) find and maintain employment and provide proof of such employment; (5) obtain safe and appropriate housing for the family, provide proof of such housing, and show no disruption in utility services or threat of eviction for a period of at least six months; (6) complete a parenting class and demonstrate skills learned during visitation with the children; (7) complete a psychological evaluation and follow any mental health treatment recommended; (8) complete a domestic violence class; (9) complete an anger

management assessment and follow all recommendations made as a result of the assessment; and (10) show equal nurturing toward all of her children, refrain from encouraging or participating in any inappropriate conversation with or around her children, and follow up on any service recommendations for her children. In July 2016, Mother's permanency plan was amended to include successful completion of a budgeting class and a requirement for Mother and Father to engage in marital counseling.

Mother's permanency plan for all three children focused solely on reintegration from the time it was prepared in September 2015 until August 2016. At this one-year point, a permanency goal of adoption was added as an alternative option for the children. At a permanency hearing in January 2017, the district court concluded Mother had failed to make sufficient progress in completing the tasks assigned in the permanency plan; thus, reintegration with her was no longer a viable option for the children. The court directed the county attorney to file a motion to terminate Mother's parental rights.

The motion to terminate parental rights was filed by the State on February 7, 2017. At a two-day trial held at the end of March, the district court heard evidence and reviewed SFCS records and other documentary evidence. Mother did not testify. After closing argument by counsel, the district court determined the State presented clear and convincing evidence, as required by K.S.A. 2016 Supp. 38-2269(a) and (g)(1), to establish that Mother was unfit by reason of conduct or condition which rendered her unable to care properly for her children, the conduct or condition was unlikely to change in the foreseeable future, and termination of parental rights was in the best interests of the children.

ANALYSIS

The district court may terminate a parent's rights when the State has shown (1) that the parent is unfit and likely will remain so for the foreseeable future and (2) that it is in

the best interests of the child to terminate the parent's rights. See K.S.A. 2016 Supp. 38-2269(a), (g)(1). Notably, a parent's rights may be terminated only when the evidence supporting termination is especially strong: under the statute, the evidence must be "clear and convincing." K.S.A. 2016 Supp. 38-2269(a). To be clear and convincing, the facts must be highly probable. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

We review a district court's decision to terminate a parent's rights by asking whether a rational fact-finder could have found it highly probable that the parent's rights should be terminated. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Because the district court—which is charged with finding the facts—terminated Mother's parental rights, we review the evidence in the light most favorable to that determination. 50 Kan. App. 2d at 1170; *In re K.W.*, 45 Kan. App. 2d 353, Syl. ¶ 1, 246 P.3d 1021 (2011). Further, in reviewing the district court's decision, we may not reweigh the evidence, judge the credibility of witnesses, or redetermine factual questions. *In re B.D.-Y.*, 286 Kan. at 705; *In re M.H.*, 50 Kan. App. 2d at 1170.

On appeal, Mother argues that the district court lacked sufficient evidence to conclude that she was presently unfit to parent the children and that her unfitness was unlikely to change in the foreseeable future.

1. *Unfitness*

The district court may base its finding of unfitness on one of several considerations outlined by the Legislature. See K.S.A. 2016 Supp. 38-2269(a)-(c). If supported by clear and convincing evidence, a single statutory basis for unfitness can support terminating a parent's rights, though courts should consider all applicable factors. K.S.A. 2016 Supp. 38-2269(f); *In re M.H.*, 50 Kan. App. 2d at 1170. Here, the district court relied on five of these statutory factors to support its finding that Mother was unfit:

1. Mother suffered from an emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render her unable to care for the ongoing physical, mental, and emotional needs of her children, K.S.A. 2016 Supp. 38-2269(b)(1);

2. Mother's use of intoxicating liquors or narcotic or dangerous drugs was of such duration or nature as to render her unable to care for the ongoing physical, mental, or emotional needs of her children, K.S.A. 2016 Supp. 38-2269(b)(3);

3. Reintegration failed, notwithstanding the fact that public and private agencies exercised reasonable efforts to get the family back together, K.S.A. 2016 Supp. 38-2269(b)(7);

4. Mother exhibited a lack of effort to adjust her circumstances, conduct, or conditions to meet the children's needs, K.S.A. 2016 Supp. 38-2269(b)(8); and

5. Mother failed to carry out a reasonable, court-approved plan directed toward reintegrating the children into her home, K.S.A. 2016 Supp. 38-2269(c)(3).

On appeal, Mother argues the State failed to present clear and convincing evidence to support any of the five statutory factors set forth above. Because carrying out the reintegration plan necessarily incorporates the preceding four factors, we focus our discussion on Mother's compliance with the terms and conditions of that plan.

The reintegration plan required Mother to report any contact with law enforcement to SFCS within 24 hours of occurrence. Mother was arrested on April 26, 2016, and ultimately charged with five offenses, including possession of methamphetamine, possession of drug paraphernalia, transporting liquor in an open container, obstructing official duty, and fleeing or attempting to elude a police officer. Mother was arrested on June 29, 2016, for suspected theft of a dress from a Dollar General store. Mother failed to notify SFCS about either of these contacts with law enforcement.

The reintegration plan also required Mother to refrain from abusing drugs or alcohol throughout the duration of the case and submit to random tests to verify compliance, as well as to obtain a drug and alcohol evaluation and follow any recommendations until successfully discharged. Although Mother completed a drug and alcohol assessment as required by the plan, she never followed through on its recommendation that she participate in outpatient substance abuse treatment, which was also required by the plan. The court determined that Mother's participation in the support group named Celebrate Recovery did not qualify as outpatient treatment. During the course of the case, Mother tested positive for drugs as set forth below:

- August 5, 2015: Mother tested positive for use of methamphetamine.
- August 11, 2015: Mother tested positive for use of methamphetamine.
- August 17, 2015: Mother tested positive for use of methamphetamine.
- September 1, 2015: Mother tested positive for use of opiates.
- March 30, 2016: Mother tested positive for use of marijuana.
- April 8, 2016: Mother tested positive for use of marijuana.
- May 4, 2016: Mother tested positive for use of marijuana.
- May 17, 2016: Mother tested positive for use of methamphetamine.
- June 10, 2016: Mother tested positive for use of marijuana.
- November 22, 2016: Mother tested positive for use of ethanol.

Moreover, and as noted in the preceding paragraph, Mother was arrested on April 26, 2016, for possession of methamphetamine, possession of drug paraphernalia, and transporting liquor in an open container. These facts show that Mother failed to refrain from abusing drugs or alcohol throughout the duration of the case and failed to participate in drug and alcohol treatment, as required by the plan.

The reintegration plan required Mother to find and maintain employment and provide proof of such employment. But Mother spent most of the time unemployed. She did find employment with Taco Tico, but she quit this job in June 2016 because her boss had yelled at her. Mother was unemployed until October 12, 2016, when she reported to SFCS that she was working for Father's aunt. These facts demonstrate that Mother failed to find and maintain employment as required by the plan.

The reintegration plan required Mother to obtain safe and appropriate housing for the family, provide proof of such housing, and show no disruption in utility services or threat of eviction for a period of at least six months. This never occurred. At the time of the original plan in August 2015, Mother was living in a tent at East Lake. In September 2015, Mother reported she was living on the streets. On September 30, 2015, Mother reported to SFCS that she had lost possession of her van, which she was living out of at the time. On November 17, 2015, Mother reported that she was living with Father in a house on Fourth Street in Newton. In November 2015, the water to the house had been shut off, although it was later reinstated. The landlord sent Mother and Father a notice of eviction in late 2015 or early 2016 because they were $2,400 behind on the rent. Mother and Father were not evicted on that particular occasion because a relative paid the amount past due. In June 2016, SFCS discovered at a home visit that the electricity had been shut off. Mother and Father subsequently were evicted from the Newton home that same month, again apparently for unpaid rent. They were homeless for several weeks living out of their car and/or camping at a nearby lake. Over the next several months, Mother and Father lived in a charity shelter and then with an aunt. Mother and Father did not rent another residence until November 2016. It was a two-bedroom trailer, which needed numerous repairs as listed by SFCS personnel in the initial home inspection. Mother complained that SFCS never returned to inspect the home after the repairs were made. According to a witness testifying on Mother's behalf at trial, however, the repairs were not completed until a few days before the State filed its motion to terminate parental

8

rights. These facts demonstrate that Mother failed to obtain safe and appropriate housing for the family as required by the plan.

The August 2015 reintegration plan also required Mother to obtain a psychological examination and follow its recommendations. Mother did not complete this evaluation until February 2016, over six months later. The report sent to SFCS from this examination indicated that Mother denied any drug use, denied safety concerns for her children, and denied marital or domestic violence issues. In addition, Mother told the examiner that the children were placed into protective custody because a friend was using drugs in the family home. Given the untruthful answers given by Mother to the individual conducting the psychological examination, SFCS advised Mother that she was required to undergo full neuropsychological testing. A new psychological evaluation was completed on August 24, 2016. Based upon the results of this testing, the psychologist recommended that Mother participate in all therapy already recommended in Mother's reintegration plan. Mother failed to follow through on the recommendations.

On February 16, 2016, an SFCS family support worker discussed budgeting with Mother after Mother posted on Facebook that she needed help getting money to feed her children. As a result, the reintegration plan was supplemented to include a requirement for Mother to successfully complete a budgeting class. But Mother reported that she already had taken a budgeting class; so instead of taking another budgeting class as required, Mother told the worker that she would write out a budget and provide it to SFCS. This budget was never provided to SFCS.

Mother's reintegration plan was amended to require Mother and Father engage in marital counseling. Mother and Father attended couples counseling from the middle of March to the end of April 2016. Pastor John Branson of a local church in Florence provided the counseling; Branson had been in the ministry since 1992 and possessed a college degree and completed some master's work. Pastor Branson is Father's second

cousin but Father only met him for the first time at the end of 2014. In late 2015, Father approached Pastor Branson about couples counseling. Father obtained SFCS approval to use Pastor Branson as their couples' counselor. Pastor Branson had conducted marriage counseling about five times previously. Father, Mother, and Pastor Branson spent eight weeks looking at different qualities of life and marriage during weekly sessions. The last session occurred on April 16, 2016. According to Pastor Branson, the parents completed all levels of the program smoothly and attended all the sessions. The pastor stayed in touch with the SFCS caseworker and kept him updated on their progress.

But the court found Mother did not meaningfully participate in marital counseling as required by the reintegration plan. Specifically, Pastor Branson testified at trial that Mother and Father did not disclose incidents of domestic violence in the past between them. In addition, Pastor Branson testified that he understood when Mother and Father started counseling that they both had stopped methamphetamine and illegal drug usage. Pastor Branson was not aware that Mother tested positive for marijuana several times in April and May 2016.

Based on the evidence presented as described above, we conclude the State met its burden to prove by clear and convincing evidence that reintegration failed, notwithstanding the fact that public and private agencies exercised reasonable efforts to get the family back together because Mother failed to carry out a reasonable, court-approved plan directed toward reintegrating the children back into her home due to a lack of effort to adjust her circumstances, conduct, or conditions to meet the children's needs. K.S.A. 2016 Supp. 38-2269(b)(7) and (c)(3). We also find clear and convincing evidence to support the district court's finding that Mother's use of intoxicating liquors or narcotic or dangerous drugs is of such duration or nature as to render her unable to care for the ongoing physical mental or emotional needs of her children. K.S.A. 2016 Supp. 38-2269(b)(3). Accordingly, we affirm the court's finding that Mother was unfit under K.S.A. 2016 Supp. 38-2269(a).

10

2. *Unfitness unlikely to change in the foreseeable future*

Separate and apart from the district court's decision that she was unfit at the time of the hearing, Mother claims the State failed to prove by clear and convincing evidence that she would be unfit and unable to care for her children in the foreseeable future, as required by K.S.A. 2016 Supp. 38-2269(a). In support of her claim, Mother argues that she could have come into compliance with the plan in a short period of time given the chance. But Mother's argument is not supported by the evidence. Even assuming the used trailer home had been repaired as requested by SFCS, it would take some time for the family to transition back to monitored supervision to placement in the home. Likewise, Mother still had failed to obtain mental health therapy as recommended by the psychologist who administered her psychological exam. Mother's employment history is spotty at best. The record reflects a pattern of instability in work and housing and there is no evidence suggesting a break in this pattern. The foreseeable future in CINC proceedings is viewed from a child's perspective because a child's perception of time differs from that of an adult. K.S.A. 2016 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008). While the two older children were 14 and 9 years of age when the case started, T.G. was only 3 months old. The older children had no confidence in their parents' ability to stay sober and create a stable home; T.G. had been in the out-of-home placement for nearly his entire life.

Based on the discussion above, we conclude the district court did not err in terminating Mother's parental rights.

Affirmed.

11